IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  11-cv-02781-LTB

LARRY GUANA,

       Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

       Defendant.
_____

ORDER
_____

Plaintiff Larry Guana appeals from the Social Security Administration Commissioner's (the "Commissioner"), final decision denying his application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act (the "SSA"), 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral arguments will not materially aid in resolving this appeal. After considering the briefs and the administrative record, I REVERSE the Commissioner's final order and REMAND for further proceedings consistent with this order and judgment.

I.  STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying his September 22, 2008, application for DIB. [Administrative Record ("AR") 9] His application was initially denied at the administrative level. [AR 44] An Administrative Law Judge ("ALJ") subsequently conducted a hearing on February 9, 2010, and issued a written ruling on July 9, 2010, denying Plaintiff's application on the basis that he was not disabled between the date he alleges that he became disabled and the date the ALJ rendered her decision. [AR 6-17]   On January 8, 2011, the Social Security Administration Appeals Council (the "Appeals Council") denied Plaintiff's administrative request

for reconsideration, making the denial final for the purpose of judicial review. [AR 1]  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II.  FACTS

Plaintiff was born on September 10, 1956, was 50 years old on his alleged onset date, and was 53 at the time of the ALJ's decision. [AR 86] He has a high school education, and his past relevant work history consists of movie theater manager, motion picture projectionist, production assembler, route sales delivery supervisor, tax preparer, babysitter, and arc welder. [AR 126, 39-40] Plaintiff alleges that he became disabled on September 22, 2007. (He originally alleged an onset date of October 31, 2006, but later amended it to September 2007.) Pursuant to 20 C.F.R. § 404.130, in order to be eligible for benefits, Plaintiff must prove that his disability began before the date through which he remained insured, which was December 31, 2011. [AR 9]  The relevant time period for determining disability is therefore September 22, 2007, through December 31, 2011. [*See* AR 9]

On December 4, 2007, Plaintiff visited his primary care physician, Stephen Vialpondo, M.D., complaining that he had bilateral knee pain for the past 10 days. [AR 182] He told Dr. Vialpondo that his knees popped a bit and had been swollen the past ten days but that they did not lock. [AR 182] Dr. Vialpondo examined Plaintiff's knees and found degenerative changes, some tenderness, and a small amount of swelling. [AR 182] He diagnosed Plaintiff with probable degenerative joint disease, prescribed the anti-inflammatory Naprosyn, and ordered x-rays. [AR 182]

Later that month, on December 20, 2007, Plaintiff saw Russell DeGroote, M.D., for bilateral knee pain. [AR 151] Plaintiff rated his pain as a four out of five but denied any catching, locking, or giving way in his knees. [AR 151] He told Dr. DeGroote that he was not regularly taking anti-inflammatory medications because it "bothered him with activity and rest." [AR 151] He also told

Dr. DeGroote that he was retired and babysat his grandchildren. [AR 151] Dr. DeGroote noted that Plaintiff "[a]ppear[ed] well" and had "no apparent distress." [AR 151] After reviewing the x-rays, Dr. DeGroote diagnosed Plaintiff with osteoarthritis of the knee and indicated that he was experiencing "early degenerative changes." [AR 151] Dr. DeGroote gave Plaintiff a lateral heel wedge and recommended regularly using anti-inflammatory medication.  He further recommended that Plaintiff consider a steroid injection if the medication was ineffective.

Plaintiff did not seek further medical attention for his knee problems before submitting his application for DIB on September 22, 2008. [AR 9] When he applied, Plaintiff was 5 feet 9 inches tall and weighed 225 pounds. [AR 120] In the disability report he submitted, Plaintiff claimed that his ability to work was encumbered by his right shoulder and arthritis. [AR 121] He claimed that he "ha[d] pain in his shoulder when it gets cold and pain in his knees all the time." [AR 121] Plaintiff stated that he had worked after his alleged onset date and was working at the time he submitted the report. [AR 121] He further stated that he did not need to change his job duties, work fewer hours, or make any job-related changes as a result of his shoulder and knee pain. [AR 121]

As part of his DIB claim, the State agency referred Plaintiff to Cameron Kesler, D.O., for a consultative exam. [AR 154-58] At that exam, which took place on December 13, 2008, Plaintiff's chief complaints were right shoulder pain and bilateral knee pain. [AR 154] Plaintiff told Dr. Kesler that "he feels very well with minimal abnormalities in that right shoulder" and that while he has "occasional twinge or occasional pains," he is "able to function without difficulty and really has no complaints of muscle weakness or significant pain in that right shoulder." [AR 154] Plaintiff told Dr. Kesler he had significant knee pain for the last three to four years and that the pain has gradually worsened such that he has a very  difficult time doing any type of prolonged walking. [AR 154] He

further stated that he had daily pain in his knee joints and that it is very difficult to go from sitting to standing, but he denied any muscle weakness. [AR 154] As to his daily routine, Plaintiff explained that he babysat a few of his grandchildren and was raising three others. [AR 155] Additionally, he was able to do most of his house and yard work without difficulty, although he had to take frequent breaks and some things such as kneeling down and prolonged walking or carrying were very difficult due to his pain. [AR 155] Dr. Kesler stated this was a "very good daily routine." [AR 155] Dr. Kesler observed that Plaintiff walked with a "little bit of a limp," but that he had no difficulty walking to the examination room and was "able to get up on the examination table without difficulty or assistance." [AR 155] He also noticed that Plaintiff was able to sit comfortably throughout the entire exam and was able to remove his shoes "without much problem." [AR 155]

Dr. Kesler did an physical exam. Examining Plaintiff's legs, Dr. Kesler observed a significant varus deformity (that is, that Plaintiff is bowlegged), some tenderness, no evidence of effusion, but quite a bit of patellar grinding in flexion and extension, as well as palpation down the patella. [AR 157] Dr. Kesler found that Plaintiff's leg strength was  five out of five. [AR 157] The examination of Plaintiff's shoulder showed "no specific abnormalities . . ., no evidence of effusion, and no bicipital tendinitis symptoms." [AR 157] Dr. Kesler similarly found that Plaintiff's arm strength was five out of five. [AR 157] Dr. Kesler diagnosed Plaintiff with bilateral knee osteoarthritis causing significant pain. [AR 157] He assessed Plaintiff with the following functional limitations: walk or stand for less than two hours, and use a cane when walking long distances or on uneven surfaces; lift up to 50 pounds occasionally and 25 pounds frequently; carry no more than 20 pounds occasionally and 10 pounds frequently; never climb, balance, kneel, crouch or crawl, and stoop only occasionally; and no work at extreme temperatures or at heights. [AR 158]   Dr. Kesler

found no restrictions on Plaintiff's ability to sit. [AR 158]

Next, in January 2009, a State agency medical consultant, Alan Ketelhohn, M.D., reviewed Plaintiff's medical records. [AR 165-68] Based on his review, Dr. Ketelhohn assessed Plaintiff with the following functional limitations: occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk up to six hours in an eight hour day, but use a cane for prolonged ambulation; sit for up to six hours in an eight hour day; push/pull limited in upper extremities; never kneel, crawl, or climb ladders, ropes, and scaffolds, and only climb stairs occasionally; and avoid concentrated exposure to extreme cold and moderate exposure to hazards like machinery and heights. [AR 165-68] Dr. Ketelhohn also stated that "Plaintiff's unassisted gait, day-care and most [household chores]/yard work support more stand/walk than alleged loss of prolonged ambulation." [AR 169]  He further stated that Dr. Kesler's two hour limitation of standing and walking was not well-supported by Plaintiff's very slight limp and lack of difficulty in removing shoes. [AR 170]

In March 2009, Plaintiff returned to Dr. Vialpondo for a general check-up, at which time Plaintiff complained of increasing knee pain. [AR 181] Dr. Vialpondo referred Plaintiff to an orthopedist for degenerative joint disease of the knees. [AR 181]

Plaintiff saw Dr. DeGroote again on March 25, 2009. [AR 177] His chief complaint was bilateral knee pain. [AR 177] Plaintiff subjectively rated his pain as an eight out of 10 and stated his knees bothered him during rest and activity. [AR 177] Upon examining Plaintiff, Dr. DeGroote observed bilateral genu varum and effusion on both knees. [AR 177] Dr. DeGroote administered a steroid injection into Plaintiff's left knee. [AR 177]  When Plaintiff returned to Dr. DeGroote three weeks later, he reported improvement in his left knee from the steroid injection, and he requested and received an injection into his right knee. [AR 176]

5

On February 4, 2010, at his attorney's request, Plaintiff saw Velma L. Campbell, M.D., for a consultative exam. [AR 186-89]  Plaintiff told Dr. Campbell that he had progressively worsening knee pain. [AR 186] Plaintiff claimed that he needed a cane to get out of chairs and that his left knee occasionally gave out when he climbed stairs. [AR 186] Dr. Campbell completed a physical evaluation of Plaintiff. [AR 187]  She observed that Plaintiff sat in the interview without pain or distress and that he did not use a cane or assistive device. [AR 187] She further observed that Plaintiff had an awkward gait, that he was bowlegged, and that he moderate difficulty stepping up and down. [AR 187] Her exam also revealed that Plaintiff's knees have medial prominence and genu verum, his left knee had moderate effusion, and bilateral patellar crepitus. [AR 188] Based on her exam, Dr. Campbell confirmed Plaintiff's diagnosis of bilateral osteoarthritis with medial deformity and effusion. [AR 188] She also recommended the following functional restrictions: limit standing and walking to three hours per day, 15 minutes at a time; avoid squatting and kneeling; limit lifting and carrying to 20 pounds for less than two hours per day and up to 10 pounds for three hours per day; reach with the right arm for less than one hour per day; and no limitation on sitting. [AR 188]  Dr. Campbell reiterated these recommendations in response to a questionnaire sent to her by Plaintiff's attorney. [AR 189-91]

## III.  LAW

To qualify for DIB under section 216(i) and 223 of the Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB for a period of disability, and be "disabled" as defined by the Act.  42 U.S.C. §§ 416(i), 423. A five-step sequential evaluation process is used to determine whether a claimant is  disabled under the SSA, which is generally defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.§ 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity. If he is, DIB is denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for DIB. Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. *See id.* §§ 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the previous four steps, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See id.* § 404.1520(g).

As relevant here, a claimant is required to establish that he became disabled prior to the expiration of his insured status. *Id.* § 404.130; *see also Potter v. Sec'y of Health & Human Servs.,* 905 F.2d 1346, 1347-48 (10th Cir. 1990).

## IV. ALJ's RULING

The ALJ found that Plaintiff met the insured requirements of the SSA through December 31, 2011. [AR 11] She ruled that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date (Step One). [AR 13]  The ALJ then found that through the hearing date Plaintiff's only severe impairment was bilateral osteoarthritis of the knees (Step Two). [AR 11] Because the ALJ determinated that Plaintiff did not have an impairment or combination of impairments that met or medically equals a listed impairment (Step Three), she assessed Plaintiff's RFC. [AR 12]  The ALJ evaluated the evidence and found that as of the hearing date, Plaintiff had the RFC  to perform light work as defined in 20 C.F.R. § 404.1567(b), except that the work should not require climbing ladders and scaffolds or more than occasional kneeling or crawling, and it should allow Plaintiff to alternate positions between sitting and standing at will.  [AR 12] As a result of Plaintiff's RFC assessment, the ALJ found that Plaintiff was able to perform his past relevant work as a theater manager, motion picture projectionist, route sales delivery supervisor, and tax preparer (Step 4).   [AR 16] Consequently, ALJ concluded at Step Four that Plaintiff was not disabled between his alleged onset date and the date of the ALJ's decision.  [AR 16, 17] The ALJ thus did not move to Step Five.

## V.  STANDARD OF REVIEW

I review the Commissioner's decision (expressed here as the ruling of the ALJ) "to determine whether the factual findings are supported by substantial evidence in light of the entire record and to determine whether the correct legal standards were applied."  *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003).  My review of the factual findings is to determine whether they "are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so

supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). "It requires more than a scintilla, but less than a preponderance." *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004).

## VI. APPEAL

Plaintiff raises four issues on appeal. The first is that the ALJ did not follow the correct legal standard when rendering her RFC assessment. The ALJ found that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) except the work should not require climbing ladders and scaffolds, more than occasional kneeling or crawling, and allows the claimant to alternate positions between sitting and standing at will." [AR 12] Plaintiff argues that this assessment fails to comport with Social Security Ruling 96-8p, which prescribes the rules an ALJ must follow when making an RFC assessment. *See* 1996 WL 374184, *3 (1996) ("SSR 96-8p"); 20 C.F.R. § 402.35(b)(1); *Nielsen v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993) (social security rulings are binding on an ALJ). I agree.

SSR 96-8p explains that the RFC assessment "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, *3. This function-by-function assessment requires the ALJ to address, *inter alia*, "an individual's limitations and restrictions of physical strength and define[] the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* at *5.

9

SSR 96-8p also explicitly and repeatedly sets forth how the ALJ must express the RFC. She "must *first* identify the individual's functional limitations or restrictions and assess his or her work-related abilities *on a function-by-function basis*, . . . Only *after* that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.* at *1 (emphases added), *3 ("At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work . . . ."). Clearly the ALJ failed in this respect: she did not first identify Plaintiff's limitations or restrictions function-by-function before expressing the RFC in terms of his ability to do light work. And the ALJ indeed found restrictions. *See* 20 C.F.R. § 404.1567(b) ("Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."), *and compare with id.* §§ 404.1567(a), (c)-(e) (definitions of sedentary, medium, heavy, and very heavy work, respectively). This could perhaps have been rendered harmless had the ALJ gone on to identify and express the RFC on a function-by-function basis, but she never did.

In addition to prescribing the way in which an ALJ must *express* the RFC assessment, SSR 96-8p also sets forth how the ALJ must *make* at that assessment. "Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities." *Id.* at *3, *5 ("[I]t is necessary to assess the individual's capacity to perform *each of these functions* in order to decide which exertional level is

appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.") (emphasis added). The assessment "must include a narrative discussion describing how the evidence supports *each* conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," and it "must . . . describe the maximum amount *of each work-related activity* the individual can perform based on the evidence available in the case record." *Id.* at *7 (emphases added).

The ALJ did not do this. Her discussion is instead very general and sweeping. She presents evidence by source, and, in certain instances, her evaluation of it, but she never ties it to a consideration of the functions or the resultant RFC findings, let alone to *separate* considerations thereof. This is problematic because the overwhelming amount of evidence discussed in the portion of the decision pertaining to the RFC is much broader than the specific findings required by the RFC assessment and cannot serve as a functional assessment *per se*. Consequently, merely presenting that evidence and an evaluation of it does not bridge the gap between the evidence and the ultimate RFC determination. Doing so requires the separate consideration of the functions and the limitations thereon. It is not apparent to me that occurred. To be sure, the ALJ does mention Plaintiff's limitations on a function-by-function basis when recapitulating the opinions of Drs. Kesler, Ketelhohn, and Campbell. [AR 15-16] This, however, still does not show me that the ALJ considered Plaintiff's limitations on a function-by-function basis. She discusses the opinions in the context of evaluating the opinions in their entirety and in and of themselves, not as part of assessing a function. And like the rest of the evidence, she fails to tie her wholesale evaluations of the opinions to a function-by-function assessment and, consequently, to her RFC determination. This is grounds for reversal. *See Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) ("Failure to apply the

correct legal standard *or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed* is grounds for reversal") (internal quotations omitted and emphasis added).

Moreover, without that analysis and findings as to each specific function, it is unclear how the ALJ resolved conflicting evidence concerning those functions. SSR 96-8p, 1996 WL 374184, *7 (in making her RFC assessment, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved"). For example, Plaintiff gave Dr. Ketelhohn's opinion "weight," the most of all the medical opinions. [*See* Ar 15-16] Dr. Ketelhohn opined that Plaintiff could sit about six hours in a eight-hour workday–*not* that he must periodically alternate between sitting and standing. Yet the ALJ's RFC determination found that Plaintiff needs to be able to alternate between sitting and standing at will. This finding cannot be explained by the opinions from Drs. Kesler and Campbell because both were given "little weight," [AR 15-16] and because they opined that Plaintiff had no limitation and his ability to sit. Nor can it be traced to other evidence. It is thus unclear how the ALJ arrived at this finding.

Ambiguities also abound. For example, it is opaque whether the ALJ's RFC includes a limitation on Plaintiff's ability to push and pull with his arms. To be capable of "full or wide range of light work," an individual must be capable of "sitting most of the time with some pushing and pulling of arm or leg controls." *See* 20 C.F.R. § 404.1567(b). This limitation is not mentioned among those specifically stated in the ALJ's RFC. One could infer, then, that the RFC does not include that restriction. The ALJ, however, granted Dr. Ketelhohn's opinion "weight" and obviously adopted much of it, and he found that Plaintiff's ability to push and pull with his arms was limited. [AR 165] This exemplifies the problems begot by failing to express the RFC on a function-by-

12

function basis. "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level." *See* SSR 96-8p ,1996 WL 374184, at \*3. A discussion that separately considered each function would likely have prevented these conflicts and ambiguities.

Defendant's opposing arguments are unavailing. Citing SSR 96-8p, he first asserts that the ALJ need not address functions which Plaintiff does not contend are limited. *See* 1996 WL 374184, \*1 ("When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."). Plaintiff does, however, allege that certain functions which the ALJ did not identify or discuss are limited. For example, as the ALJ stated, Plaintiff alleged difficulty carrying and that his knee pain limits his ability to walk to just two or three blocks. [Ar 13] There is also not "no information in the case record" that Plaintiff has limitations on the functions. [*See*, *e.g.*, AR 154-58, 165-68, 186-89]  Even Dr. Ketelhohn opined that Plaintiff's functions were limited. [AR 165-68]

Defendant similarly asserts that the ALJ is not required to include limitations in his RFC assessment that are not supported by the medical record.  While this assertion is true, the fact is that here the ALJ's RFC contained limitations, see 20 C.F.R. § 404.1567(b), and the ALJ was required to identify and separately consider them. SSR 96-8p, 1996 WL 374184, \*5.  In doing so, she was obligated to describe how the evidence supports each conclusion, citing specific medical facts and

nonmedical evidence, and to explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.* at *7. As explained, she did neither.

Defendant next contends that the RFC determination was not erroneous because by stating that Plaintiff's work should not require climbing ladders or scaffolds or more than occasional kneeling or crawling, and should allow him to alternate between sitting and standing at will, it does assess and articulate the specific functions in which Plaintiff is limited. I need only point out one defect in this argument to dispose of it. SSR 96-8p states that the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Id.* at *1. The physical functions are sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* at *5. At a minimum, the "specific functions" Defendant points to make no mention of lifting, carrying, pushing, and pulling.

Pursuing a slightly different vein, Defendant argues that the ALJ's assessment is a sufficient function-by-function analysis because, by the definition of "light" work, she determined that Plaintiff had the RFC to perform certain levels of the physical functions. *See* 20 C.F.R. § 404.1567(b). This argument is meretricious. For one, it completely ignores SSR 96-8p's explicit requirement that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," and "[o]nly after that may RFC be expressed in terms of the exertional levels of work." 1996 WL 374184, *1, *3. For another, it does not remedy the fact that the decision fails to demonstrate that the ALJ separately considered each function and that the decision  lacks a narrative discussion describing how the evidence supports her findings as to each function and explaining how material

14

inconsistencies or ambiguities in the evidence were considered and resolved with respect to her RFC findings. *Id.* at 7.

Defendant lastly argues that the fact that the ALJ's ultimate RFC finding did not discuss every possible function is not determinative of whether she performed a function-by-function assessment. He asserts that the ALJ discussed the various medical opinions in the decision, noted her assessment was consistent with objective medical evidence, and included a function-by-function assessment when she posed hypothetical questions to the vocational expert. I already explained that the ALJ's subsequent discussion of her RFC determination was inadequate, and none of these arguments change that. Additionally, the ALJ did not include a function-by-function assessment when posing questions to the vocational expert; she still identified and expressed Plaintiff's RFC as the ability to do "light" work. [*See* AR 40-41]

The case that Defendant cites in support of this argument, *Ren v. Astrue*, 2009 WL 3497785 (D. Colo. Oct. 29, 2009), also lends no him succor. There the ALJ determined that the plaintiff has the RFC to "perform light work that does not have complex tasks." *Id.* at *5. The plaintiff appealed and argued that the RFC assessment was not based upon the correct legal standards contained in 96-8p because it failed to consider all of the plaintiff's limitations on a function-by-function basis. *Id.* at *6. I disagreed. I found the function-by-function analysis requirement of SSR 96-8p to be "less critical" because the ALJ determined that the Plaintiff was unable to do past relevant work. *Id.* I also disagreed with the Plaintiff in *Ren* because although the final RFC determination only referred to "light work," the ALJ's subsequent analysis discussed in detail the various medical reports relating to the plaintiff's ability to perform all seven strength demands. *Id.* By contrast, the ALJ here concluded that the Plaintiff was *able* to do past relevant work, suggesting that the function-by-

function analysis was critical.  *See* SSR 96-8p ,1996 WL 374184, at *3. Additionally, here, the

ALJ's subsequent discussion does not evince a function-by-function analysis.

For these reasons, I conclude that the ALJ failed to properly follow and apply the correct

legal standard–SSR 96-8p–when making her RFC assessment.  To be clear,  I do not comment as

to whether the RFC assessment is supported by substantial evidence; it may be. But the "failure to

apply the correct legal standard or to provide this court with a sufficient basis to determine that

appropriate legal principles have been followed is grounds for reversal." *Byron*, 742 F.2d at 1235

(internal quotations omitted); *Watkins v. Barnhart,* 350 F.3d 1297, 1298 (10th Cir. 2003) (reversing

and remanding because the ALJ did not follow the correct legal standards). I thus reverse and

remand so the ALJ can demonstrate that she assiduously follows SSR 96-8p (along with other

pertinent rules and regulations) to arrive at her RFC determination–whatever that determination may

be.

While I do not imply this should occur, I am aware that as a result of sedulously applying

96-8p on remand, the ALJ's subsequent evaluations and conclusions could change, including those

that are the subject of this appeal.  *See, e.g.*, SSR 96-8p, 1996 WL 374184, *3 (the "[i]nitial failure

to consider an individual's ability to perform the specific work-related functions could be critical to

the outcome of a case.").  Consequently, I will not address Plaintiff's remaining objections to the

ALJ's decision.  *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by

appellant because they may be affected by the ALJ's treatment of this case on remand.").

16

**VII. Conclusion**

For the foregoing reasons, I REVERSE the Commissioner's final order, and I REMAND the matter to the Commissioner for further proceedings consistent with this order and judgment.


Dated: January   28  , 2013, in Denver, Colorado.

BY THE COURT


    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE